UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**CARL D. ANSLOW,**                       Case Number 1:13 CV 100

    Plaintiff,                       Magistrate Judge James R. Knepp II

    v.                       MEMORANDUM OPINION AND ORDER

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.

## INTRODUCTION

Plaintiff Carl D. Anslow seeks judicial review of Defendant Commissioner of Social Security's decision to deny Disability Insurance Benefits (DIB) and Social Security Income (SSI). The district court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3). The parties have consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 12). For the reasons stated below, the Court affirms the Commissioner's decision denying benefits.

## PROCEDURAL BACKGROUND

On January 13, 2009, Plaintiff filed an application for DIB and SSI claiming he was disabled due to bipolar and other mood disorders, severe depression, and anxiety/rage disorder. (Tr. 116, 119, 161). He alleged a disability onset date of December 12, 2007. (Tr. 36). His claims were denied initially (Tr. 67, 70) and on reconsideration (Tr. 77, 81). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 90). Plaintiff, represented by counsel, and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (Tr. 24, 32). The Appeals Council denied Plaintiff's request for review, making the hearing

decision the final decision of the Commissioner. (Tr. 4); 20 C.F.R. §§ 404.955, 404.981, 416.1455. On January 15, 2013, Plaintiff filed the instant case. (Doc. 1).

## FACTUAL BACKGROUND

### Personal and Vocational History

Born October 22, 1975, Plaintiff was 35 years old at the time of the ALJ decision. (Tr. 11, 154). He has a high school education and special job training in welding. (Tr. 38, 166-67). Prior to his alleged disability, Plaintiff worked as a cook, maintenance personal, shipping/towing motor driver, shop cleaner, clerk, and fry cook. (Tr. 162). Plaintiff was fired from his last job for damaging equipment when he threw a toaster on the ground because he was angry. (Tr. 190).

Plaintiff has no permanent residence and stays wherever he can, often with friends. (Tr. 38, 181). A typical day consists of getting up to take pills, showering, putting on clean clothes, sometimes eating, either walking around or staying in the house, talking to a few people, listening to music, and then going to bed. (Tr.182). Plaintiff indicated he needs reminders to take pills and complete grooming needs. (Tr. 183-84). Concerning daily activities, Plaintiff did laundry, cleaned dishes, cooked, and cleaned. (Tr. 184). Occasionally, Plaintiff's daughter would visit. (Tr. 182).

### Medical Evidence

In August 2006, Plaintiff sought medication from Dr. El-Sayegh for chronic irritability and anger issues. (Tr. 319-20). Plaintiff denied difficulty sleeping, concentrating, or feeling depressed, helpless, hopeless, lethargic, or anxious. (Tr. 319). Plaintiff suggested he rarely used alcohol but occasionally used marijuana because it was the only thing which calmed him down. (Tr. 319).

A mental status examination revealed Plaintiff was polite, cooperative, and calm with normal speech, good eye contact, and no evidence of psychosis. (Tr. 320). Dr. El-Sayegh assessed bipolar affective disorder and prescribed Depakote. (Tr. 320-21). He assigned a global assessment of functioning score (GAF) of 60 to 70[1] and advised Plaintiff discontinue marijuana use and attend individual therapy. (Tr. 320-21).

Plaintiff attended therapy sessions once or twice a month and had monthly medication checks with Dr. El-Sayegh. (Tr. 239-318). After Dr. El-Sayegh adjusted Plaintiff's medications, Plaintiff reported on several occasions that he was "doing well" and reported no drug abuse and little or no alcohol abuse. (Tr. 288, 292, 298, 303).

In October 2008, Plaintiff sought emergency room treatment at Ashtabula County Medical Center ("Ashtabula") complaining of suicidal and homicidal thoughts following a break-up with his fiancé – the mother of his daughter. (Tr. 238-40, 251). Plaintiff admitted using marijuana and alcohol the previous day, but claimed he had not used cocaine since May 2008. (Tr. 253). Blood tests were positive for marijuana (THC) and benzodiazepines. (Tr. 238, 256). Plaintiff was transferred to Heartland Behavioral Healthcare for eleven nights and responded well to medications. (Tr. 258-59). At discharge, Venkat Balsa, M.D., diagnosed Plaintiff with

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers). *Id.*, at 34. A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood or mild insomnia) OR some difficulty in social, occupational, or school functioning, (e.g., occasional truancy or theft within the household) but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

mood disorder, cannabis dependence, benzodiazepine abuse, alcohol abuse, and assigned a GAF score of 55.[2] (Tr. 260).

Plaintiff returned to Dr. El-Sayegh in November 2008, one month after a stay in the hospital. (Tr. 280). Plaintiff reported having no suicidal or homicidal ideations but did report he had stopped taking medication because he was doing well. (Tr. 280). However, his progress came to a halt when he found out his fiancée was cheating on him. (Tr. 280). He admitted to using crack cocaine and drinking alcohol starting in 2007 and continuing through the summer of 2008. (Tr. 280). Plaintiff denied, however, using drugs or alcohol since his hospitalization, and stated his medications helped. (Tr. 280-81).

Dr. El-Sayegh continued to treat Plaintiff monthly from December 2008 through May 2009. (Tr. 269, 273, 393, 395, 397). This time was characterized by off and on drug use. (Tr. 269, 273, 393, 395, 397). Plaintiff cancelled his February 2009 appointment. (Tr. 401). In March 2009, Plaintiff was facing jail time for driving a car without a license and reported anxiety, some depression, and a lot of stress. (Tr. 397). In April, Plaintiff indicated "occasional" irritability and "some" anxiety but also stated Celexa was beneficial. (Tr. 395). In May, he claimed to experience anxiety, depression, and irritability. (Tr. 393). Throughout this time, Dr. El-Sayegh continued to adjust Plaintiff's medications and recommend therapy. (Tr. 273, 393, 397).

On June 4 2009, Plaintiff reported he had stopped using his medications because they were too expensive and made him feel "foggy". (Tr. 392). Plaintiff wished to resume his medication regimen because he noticed his mood was worsening and he was experiencing more angry outbursts. (Tr. 392).

---

2. *DSM-IV-TR*, *supra*, note 1.

4

A few weeks later, Plaintiff presented to the emergency room at Ashtabula for treatment of depression and suicidal thoughts. (Tr. 355). He tested positive for marijuana and benzodiazepines. (Tr. 360, 370). Upon release, he was diagnosed with mood disorder and cannabis dependence and instructed to see Dr. El-Sayegh. (Tr. 356, 361).

Plaintiff saw Dr. El-Sayegh after self-admittance to the hospital for depression and suicidal ideation. (Tr. 355, 388). Plaintiff reported hearing voices when he was relaxing and having recent suicidal thoughts. (Tr. 388).

Dr. El-Sayegh continued to treat Plaintiff from July 2009 through January 2010. (Tr. 377-385). During this period, Plaintiff denied both using drugs and entertaining thoughts of suicide, but did admit to consuming some alcohol. (Tr. 377-385).

On February 16, 2010, Plaintiff was hospitalized after overdosing on prescription medications, drinking, and doing cocaine. (Tr. 409, 448, 508). Plaintiff acknowledged having suicidal thoughts the previous two weeks and admitted a history of cocaine dependence spanning the past three years. (Tr. 409, 461). While at the hospital, a mental status examination revealed Plaintiff was steady, alert, and oriented. (Tr. 463). At the time of discharge, Plaintiff was diagnosed with mood disorder, cocaine and alcohol abuse, marijuana and nicotine dependence, and assigned a GAF score of 54.[3] (Tr. 463).

Plaintiff resumed treatment with Dr. El-Sayegh through December 2010. (Tr. 528, 535, 541, 547). In March 2010, Dr. El-Sayegh completed mental assessment forms indicating Plaintiff had a marked impairment in ability to relate to other people, but mild or moderate impairments in all other areas of mental work functioning. (Tr. 523-25). Dr. El-Sayegh diagnosed Plaintiff with bipolar affective disorder and polysubstance abuse. (Tr. 524). He further opined Plaintiff's

---

3. *See DSM-IV-TR*, *supra*, note 1.

condition was likely to deteriorate if placed under stress, especially stress induced by a job, and would be absent from work more than three times per month. (Tr. 524). Dr. El-Sayegh acknowledged Plaintiff was currently abusing drugs and alcohol, but nevertheless opined Plaintiff would have the same mental limitations if he were not abusing these substances. (Tr. 525).

In July of 2010, Plaintiff told Dr. El-Sayegh he was living with his ex-fiancée and getting along "ok" even though they were no longer in a relationship. (Tr. 528). On examination, Plaintiff was calm and cooperative with good eye contact and no pressured speech. (Tr. 528).

In December 2010, Plaintiff admitted using drugs and alcohol and reported increased anxiety and irritability. (Tr. 547). Dr. El-Sayegh advised Plaintiff to discontinue his substance use and resume Celexa. (Tr. 547). He also increased Plaintiff's dosage of Seroquel. (Tr. 547).

**State Agency Opinion Evidence**

On March 9, 2009, clinical psychologist Richard C. Halas, M.A., examined Plaintiff. (Tr. 325-28). Mr. Halas diagnosed major depression, recurrent type; polysubstance abuse, currently in remission; and generalized anxiety disorder with occasional panic attacks and some phobia. (Tr. 328). He assigned a GAF score of 45[4], but stated "[Plaintiff's] functional severity is above this level, at 55." (Tr. 328). Mr. Halas opined Plaintiff's mental abilities to understand, remember, and follow instructions, and, maintain attention and concentration to perform simple, repetitive tasks, were not impaired. (Tr. 328). However, he opined Plaintiff had marked impairments in abilities to relate to others (including co-workers and supervisors) and withstand work pressures and stress. (Tr. 328).

---

4. A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job.)" *DSM-IV-TR*, at 34.

6

In April 2009, Tasneem Khan, Ed.D., reviewed Plaintiff's medical records. (Tr. 332-50). Dr. Khan questioned third party reports of sobriety because treatment notes indicated intermittent substance abuse. (Tr. 349). He also challenged Plaintiff's social functioning limitations because while Plaintiff alleged an inability to get along with others, he was able to interact appropriately with his treating source and treatment providers at the hospital. (Tr. 349-50). In addition, Plaintiff reported having a girlfriend in the past, living with friends, and appeared cooperative and appropriately motivated during interviews. (Tr. 349). Dr. Khan concluded Plaintiff retained the capacity to learn and perform simple, routine, repetitive tasks in a predictable environment where contact with others was occasional and superficial. (Tr. 350). In November 2009, Roseann Umana, Ph.D., affirmed Dr. Khan's assessment as written. (Tr. 372).

**Vocational Testimony and ALJ Decision**

At the hearing, the ALJ asked the VE to consider a hypothetical person of the same age, education, and work experience as Plaintiff who had no physical limitations, but could perform only simple, routine, low-stress work, which was generally in an isolated setting with occasional supervision and occasional interactions with the public and co-workers. (Tr. 57). The VE responded such an individual could perform Plaintiff's past work as a shop cleaner as well as medium unskilled work such as hand packager, laundry laborer, and store laborer/clerk. (Tr. 57).

On March 4, 2011, the ALJ found Plaintiff had severe impairments including mood disorder, depression, anxiety, cocaine abuse, alcohol abuse, and cannabis dependence. (Tr. 17). The ALJ also found these impairments, including the substance use disorder, met listings 12.04 and 12.09 of 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 17). However, the ALJ concluded if Plaintiff stopped the substance use, Plaintiff would not meet or medically equal a listed impairment. (Tr. 18-19).

7

The ALJ discussed the record evidence and concluded if Plaintiff stopped substance use, he had the residual functional capacity (RFC) to perform a full range of work at all exertional levels, except he was limited to performing simple, routine work with low stress (defined as no more than occasional changes in the work setting) and few work-related decisions. (Tr. 19). In addition, Plaintiff could perform jobs requiring no more than occasional interaction with the public and co-workers, in an isolated setting with occasional supervision. (Tr. 19). Based on VE testimony, the ALJ found Plaintiff could perform past work as a shop cleaner, or, alternatively, could work as a hand packager, laundry laborer, or store laborer/stock clerk. (Tr. 22-23). Thus, Plaintiff was found not disabled. (Tr. 24).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence, or indeed a preponderance of the evidence, supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for SSI and DIB is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. Then, the burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only found disabled if he satisfies each element of the analysis, including inability to do other work, and meets the durational requirements. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

9

**DISCUSSION**

Plaintiff argues the ALJ erred by 1) failing to provide good reasons for affording Dr. El-Sayegh's opinion moderate weight; 2) assigning greater weight to non-examining state agency consultants than to Plaintiff's treating physician; and 3) failing to acknowledge that the state-agency consultants did not review Dr. El Sayegh's opinion. (Doc. 17, at 12-18). Plaintiff's arguments implicate the well-known treating physician rule.

**Treating Physician Rule**

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* Social Security Ruling (SSR) 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242.

A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 404.1527(c)(2). In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship – length, frequency, nature and extent; (3) supportability – the extent to which a physician supports his findings with medical

signs and laboratory findings; (4) consistency of the opinion with the record as a whole; and (5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* An ALJ's reasoning may be brief, *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009), but failure to provide any reasoning requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409-10 (6th Cir. 2009).

Good reasons are required even when the conclusion of the ALJ may be justified based on the record as a whole. The reason-giving requirement exists, in part, to let claimants understand the disposition of their cases, particularly in cases where a claimant knows his physician has deemed him disabled and might be bewildered when told by an ALJ he is not, unless some reason for the agency's decision is supplied. *Wilson*, 378 F.3d at 544 (quotations omitted). "The requirement also ensures the ALJ applied the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.*

Last, "the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight." *Douglas v. Comm'r of Soc. Sec.*, 832 F. Supp. 2d 813, 823-24 (S.D. Ohio 2011). This is because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." *Id.*; § 416927(c), (d); SSR 96-6p, 1996 WL 374180, at *2-3. "Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as

11

treating physicians including supportability, consistency, and specialization." *Douglas*, 832 F. Supp. 2d at 823-24.

Here, Plaintiff's first contention is "the ALJ never assigned a 'sufficiently specific' weight to the opinion of Dr. El-Sayegh." (Doc. 17, at 15-16). This argument derives from the ALJ's use of the terms "moderate weight" and "slight weight" in reference to different aspects of Dr. El-Sayegh's opinion. (Tr. 18, 22).

To this end, the ALJ gave Dr. El-Sayegh's opinion "moderate weight" when considering Plaintiff's impairments including substance abuse because the evidence demonstrated Plaintiff showed significant improvement when not abusing substances. (Tr. 18). When abusing drugs and alcohol, Plaintiff was prone to suicidal and homicidal ideations and significant irritability. (Tr. 18). However, the ALJ gave Dr. El-Sayegh's opinion "slight weight" when considering Plaintiff's impairments absent substance abuse because the opinion was not supported by objective clinical findings and treatment notes when Plaintiff was not abusing substances. (Tr. 22). Instead, the ALJ stated in his decision, the evidence showed the true basis of Plaintiff's disability was drug and alcohol abuse. (Tr. 18). Therefore, while the ALJ did assign Dr. El-Sayegh's opinions differing weights, it was clear what weight was assigned to the variant aspects of Dr. El-Sayegh's opinion. *See* SSR 96-5p, 1996 WL 374183, at *4 ("[M]edical source statements may actually comprise separate medical opinions").

Plaintiff next asserts the ALJ failed to provide "good reasons" for granting Dr. El-Sayegh's opinion less than controlling weight. (Doc. 17, at 16-17). In his opinion, Dr. El-Sayegh indicated Plaintiff had mild-to-moderate functional limitations, except he was markedly limited in ability to relate to others. (Tr. 523-24). Dr. El-Sayegh also indicated Plaintiff would be expected to miss more than three days of work per month and indicated even if Plaintiff were not

12

abusing drugs and alcohol, he would still be mentally ill. (Tr. 523-25). By discussing the lack of support and inconsistent nature of Dr. El-Sayegh's opinion with the record as a whole, the ALJ provided good reasons for the weight credited to Dr. El-Sayegh's opinion.

Related to supportability, the ALJ noted Dr. El-Sayegh's opinion contradicted his own objective clinical findings and treatment notes when the Plaintiff was not abusing drugs and alcohol. Specifically, Dr. El-Sayegh's notes demonstrated when sober, Plaintiff was calm and cooperative without suicidal or homicidal ideations. (Tr. 22, 280, 288, 292, 298, 303, 377-85, 388, 528, 535, 541). As the ALJ indicated, on one occasion the Plaintiff reported to Dr. El-Sayegh, that he had not used drugs or alcohol since the summer, felt "great", and was calm, cooperative, with a bright affect, good eye contact, and no suicidal or homicidal thoughts. (Tr. 21, 280). Conversely, when Plaintiff admitted to recent drug abuse, he had homicidal or suicidal thoughts, a constricted mood, and reported a worsening mood and increased irritability. (Tr. 280, 319-20, 392, 547).

Additionally, the ALJ noted Dr. El-Sayegh's opinion was inconsistent with the weight of the medical evidence, which similarly revealed Plaintiff showed significant improvement when he was not abusing substances. (Tr. 18). The ALJ observed all three of Plaintiff's hospitalizations (October 2008, June 2009 and February 2010) were during periods of substance abuse. (Tr. 17, 238, 355, 360, 409, 448, 508, 541). However, after receiving treatment (and sobering up), Plaintiff was said to be doing well and mental status examinations were unremarkable. (Tr. 258-59, 463, 541). Moreover, during a consultative examination, Plaintiff denied drug or alcohol problems and he was noted to be cooperative and appropriately motivated without problems in flow of conversation or thought, despite elevated levels of anxiety and feelings of hopelessness, helplessness, and worthlessness. (Tr. 21, 325-28).

Furthermore, the ALJ indicated the objective treatment evidence showed Plaintiff had no more than moderate functional limitations when sober. (Tr. 22). For example, the ALJ pointed to Plaintiff's consultative examination. (Tr. 21, 325-28). There, Mr. Halas found Plaintiff's mental abilities were not impaired, aside from his abilities to relate to others and withstand work pressures and stress. (Tr. 328). Mr. Halas attributed Plaintiff's impairments to substance abuse, noting that due to his history of substance abuse and non-involvement in a 12-Step program, Plaintiff's ability to manage funds in an appropriate, practical, and realistic manner was compromised. (Tr. 328). Finally, Dr. Khan's assessment found mild to moderate limitations when sober and noted he was cooperative and appropriately motivated. (Tr. 332-349). Dr. Khan also commented that Plaintiff had a demonstrated ability to get along with others and his medications were helpful. (Tr. 349).

In sum, by citing to the relevant factors articulated in 20 C.F.R. § 404.1527(d)(2), including supportability and consistency, the ALJ satisfied the treating physician rule with respect to Dr. El-Sayegh.

Next, Plaintiff argues the ALJ improperly afforded more weight to the state agency consultants. (Doc. 19, at 6). The state agency consultants are considered non-treating sources because they examined Plaintiff only once, and did so for purposes of providing a report for Plaintiff's disability claim. 20 C.F.R. § 404.1502; *see also* 20 C.F.R. § 404.1502. As non-treating sources, their opinions are not entitled to controlling weight. Nevertheless, the opinions of one-time examining sources are weighed under the same factors as treating physicians "including supportability, consistency, and specialization." *Douglas*, 832 F. Supp. 2d at 823-24.

Here, the ALJ gave the opinions of the state agency consultants moderate weight because they were found to be "generally consistent with the evidence regarding the claimant's

14

functioning when sober." (Tr. 22); *see Douglas*, 832 F. Supp. 2d at 823-24. However, the ALJ discounted their opinions to the extent they failed to opine upon Plaintiff's functioning when sober. (Tr. 22). As explained above, the record reflects that Plaintiff generally had mild-to-moderate impairments when sober, but struggled with more significant limitations during periods of alcohol and drug abuse. The ALJ based his assignment of weight on the record as a whole, including consistency with Dr. El-Sayegh's treatment notes and the objective findings in the record, as previously described. Therefore, the ALJ properly provided good reasons for the weight assigned to the state agency physicians, including supportability and consistency with the record as whole.

Lastly, Plaintiff argues the ALJ assigned greater weight to the opinions of non-examining state agency consultants while failing to consider that the state agency consultants never reviewed Dr. El-Sayegh's opinion. (Doc. 17, at 18). As support, Plaintiff relies on *Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011) and *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009).

In *Blakley*, the Sixth Circuit held the ALJ's decision to accord greater weight to state agency physicians over treating sources was reversible error, because the consultants' opinions were based on an incomplete record. 581 F.3d at 409. In *Stacey*, the ALJ adopted the opinion of a state agency physician who did not review an examining physician's assessment of the plaintiff's physical capabilities before preparing his report. *Stacey*, 581 F.3d at 520. The court remanded the case in part because "the ALJ's opinion gave no 'indication' that he 'at least considered' that the state agency physician had not reviewed all of the evidence in the record before giving his opinion significant weight." *Id.* at 520 (citing *Blakely*, 581 F.3d at 409). When read together, *Stacey* and *Blakely* generally stand for the proposition that an ALJ must consider

15

all relevant evidence and provide good reasons for the weight afforded to opinion evidence. *Curry v. Colvin*, 2013 WL 5774028, at *17, *19 (N.D. Ohio 2013) (holding "both *Blakely* and *Stacey* stand on their own facts.").

These cases are distinguishable. In the instant case, the ALJ properly assigned weight to the opinions of the treating physician and state agency consultants, as explained above. Notably, it is not whether the state agency consultants examined the treating physician's records, rather the issue turns on whether the ALJ considered all relevant factors in his analysis. *Belew v. Astrue*, 2012 WL 3027114, at *7 (E.D. Ky. 2012) ("The ALJ did not need to specifically discuss the evidence that was not reviewed by [the state agency physician] in order to rely on his assessment, as long as he considered the [treating physician's] opinion and 'provided good reasons for discounting it.'") (quoting *Helm v. Comm. of Soc. Sec. Admin.*, 405 F. App'x 997, 1002 (6th Cir. 2011)). Further, unlike *Blakely*, the ALJ did not rely on a state agency consultant's opinion which failed to consider "over 300 pages of medical evidence". *Blakely*, 581 F.3d at 409. Instead, the ALJ in this case recognized and evaluated all of the treatment evidence of record.

Therefore, the ALJ met his burden by thoroughly discussing the record, thereby giving "some indication" that he considered the fact the state agency consultants did not review Dr. El-Sayegh's opinion. *See Blakely*, *supra*.

### CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the Court finds substantial evidence supports the ALJ's decision. Therefore, the Court affirms the Commissioner's decision denying benefits.

IT IS SO ORDERED.

s/James R. Knepp II
United States Magistrate Judge